## MIGUEL RAMIREZ V. THE STATE.

No. 23203. Delivered December 12, 1945.

The opinion states the case.

W. A. Hogan and Albert Pena, both of San Antonio, for appellant.

Ernest S. Goens, State's Attorney, of Austin, for the State.

KRUEGER, Judge.

The offense is seduction. The punishment assessed is confinement in the state penitentiary for a term of two years.

Appellant brings forward quite a number of complaints. His chief contention is that the evidence is insufficient to justify and sustain his conviction for the following reasons, to-wit: First, that the prosecutrix is not corroborated as to the promise of marriage nor as to the act of sexual intercourse; and second, that if any promise of marriage was made in consideration of sexual favors, it was a conditional promise, the condition being that he would marry her in the event something happened to her as a result of the act of sexual intercourse. In consequence of his contentions, we have read the statement of facts with great care. With his first contention we cannot agree for the reason that as to the promise of marriage she is corroborated by Ramon Almonderez, Mrs. Pauline Trevino, and others. Appellant, who testified in his own behalf, admitted that he had sexual intercourse with the prosecutrix at the Mexico Hotel and had such acts with her prior thereto. This was sufficient corroboration to meet the requirements of the law.

His second contention presents a more perplexing question in view of the uncertainty and indefiniteness of her testimony. We will quote some of the pertinent parts of her testimony given on direct examination:

"I live at 2200 San Fernando Street, San Antonio, Texas, and am seventeen years of age. I went to the 9th grade in school. I am acquainted with the defendant, Miguel Ramirez. He lives across the street from me and I have known him for five years. I really met him in August of last year. * * * Miguel Ramirez asked me to marry him at Woodlawn Lake about August 15th of last year. There was nobody present when he asked me to marry him, but later * * * he told my mother and he told my friends. * * * The statement was made before the 17th day of September, 1944. * * * That was about the 1st of September. * * * About the 17th day of September, 1944, we went to a hotel because he wanted to talk with these people because he had plans for our wedding. * * * When we got to the hotel he started kissing me and pushing me against the bed and he had sexual relations with me then at that time. We remained at the hotel about three hours. At that time he wanted to be married on payday. * * * After he had sexual relations with me at the hotel we had such relations about every eight days, and that went on until January, 1945. At these various times he kept telling me we were going to be married on payday."

On cross-examination she testified, among other things, as follows:

"I went out to a ranch with him about August 15th. * * * That was the first time I was ever out with him, but later on I went out with him in an automobile. I did not have intercourse with him in the automobile on August 15th. That was in September. It is true that I did go out with him at various times in an automobile and I had intercourse with him at various times in an automobile. That was right after August 15th, and later on we went to a room. * * * I did not talk with anyone about going out with Miguel until after I had been to that room. I never said anything to my mother until the 21st day of January, and then I told her that I was pregnant, and then I demanded that he marry me or I would send him to the penitentiary. I was out with Miguel in his car and he asked me to go to this hotel room and he was going to tell me who would be the best man and who the bridesmaids would be. Then I saw him the next day when he came by for me where I was working and brought me home and thereafter I saw him almost every day. I did not have intercourse with him the first time I went out with him; that occurred about a month later. The times I had intercourse with him was after September 17th."

On re-direct examination she testified that she did not know that he had a common-law wife at the time in question.

On re-cross examination she further testified as follows:

"When we went to the hotel he told me that if anything happened to me he would take care of me and marry me. That is the reason I went to the hotel."

Thereupon the following questions were propounded to her and she made the following replies:

"Q. Because he promised you if anything happened to you he would marry you? No, sir. I went there with him because he had plans for the wedding.

"Q. He told you if anything happened to you he would marry you? No, sir, not when we were in the car.

"Q. But when you went to the hotel? A. After that he did.

"Q. Later on when something happened to you, you called him and asked him to make good the promise made you at the hotel? A. He promised to marry me on August 15th. That was September.

"Q. He did not make you any promise at the Mexico Hotel? A. Yes, sir. He told me if anything happened to me he would marry me."

In determining the sufficiency of this evidence, we must view it in the most favorable light to the State, and if it measures up to the requirements of the law, it is our duty to sustain and uphold the verdict of the jury; but, on the other hand, if it fails to do so, it is likewise our duty to reverse the conviction.

The evidence in this case, when condensed, amounts to this: Prior to August 15, 1944, the prosecutrix knew appellant by sight only. They had never before had any social contact with each other. On the day and date aforesaid, she went with him in his automobile to a ranch, and on this trip he told her that he would marry her. No other fact or circumstance is disclosed by which he manifested any love or affection for her or she for him. This was a blunt promise of marriage. The next time that she went riding with him was on September 17th, and while they were riding around in his automobile, he suggested to her that they go to a hotel and there decide who should be the best man and who should be the bridesmaids. Just why this matter could not have been discussed in the automobile is not disclosed by the record. After they arrived at the hotel, they registered, engaged a room, and after entering the same, he began to hug and kiss her, and then pushed her against the bed and had an act of sexual intercourse with her, at which time he promised to marry her on payday. Thereafter, they had sexual intercourse at intervals of about eight days up until in January of the following year. On each of such occasions he promised that he would marry her on payday. Just when payday was is not disclosed by the record. The matter is left in a state of uncertainty. Again, according to her testimony, after they entered the room of the hotel, he kissed her and shoved her over on the bed and had an act of sexual intercourse with her upon a promise of marriage. Whether such promise was an unconditional promise or was conditioned upon the event something happened to her is also left in a state of uncertainty. However, if it was an unconditional promise of marriage, yet it appears to us incredible that a virtuous young girl, on her second time out riding with a young man, would place such implicit confidence in his promise of marriage that she would yield to his request for sexual intercourse and surrender her virtue. It occurs that such conduct on her part was likely prompted more by lust and an inordinate desire for sexual intercourse than by love and affection for her escort. This being true, can it be seduction under the law and decisions of this state? We do not think so.

In the case of Spenrath v. State, 48 S. W. 192, (193), this court quoted with approval from an opinion delivered by the Supreme Court of Missouri in the case of State v. Reeves, 97 Mo. 668, 10 S. W. 841, 10 Am. St. Rep. 349, as follows:

"No one can with any degree of plausibility contend that a virtuous female could be seduced without any of those arts, wiles, and blandishments so necessary to win the hearts of the weaker sex. To say that such a one was seduced by simply a blunt offer of wedlock in futuro, in exchange for sexual favors in *praesenti,* is an announcement that smacks too much of bargain and barter, and not enough of betrayal. 'Tis hire or salary, not seduction."

This pronouncement is followed in the following cases: Murphy v. State, 65 Tex. Cr. R. 55, 143 S. W. 616; Gleason v. State, 77 Tex. Cr. R. 300, 178 S. W. 506; Muckelroy v. State, 83 S. W. (2d) 324, 128 Tex. Cr. R. 560; Herridge v. State, 76 S. W. (2d) 522, 127 Tex. Cr. R. 284; Roccaforte v. State, 143 Tex. Cr. R. 340; 158 S. W. (2d) 783.

We have reached the conclusion that the evidence, as disclosed by the record, does not establish the accused's guilt beyond a reasonable doubt. Such is the only logical conclusion to be arrived at by a careful analysis of the prosecutrix' testimony. Consequently, we are unwilling to permit this conviction to stand. It may be that upon another trial the evidence may be more clearly developed so as to show more than a blunt promise of marriage in exchange for sexual favors.

From what we have said, it follows that the judgment should be reversed and the cause remanded, and it is so ordered.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.